

# COURT OF APPEALS

### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-10-00167-CR

CHRISTOPHER JAMES SPAIN II                                              APPELLANT

V.

THE STATE OF TEXAS                                                              STATE

----------

### FROM CRIMINAL DISTRICT COURT NO. 1 OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

A jury convicted Appellant Christopher James Spain II of aggravated assault with a deadly weapon and assessed his punishment at fifteen years' confinement. The trial court sentenced him accordingly. In two issues, Appellant contends that the evidence is insufficient to support his conviction and that the trial court erred by limiting his cross-examination of the complainant. Because

----

[1]*See* Tex. R. App. P. 47.4.

we hold that the evidence is sufficient and that the trial court did not abuse its discretion or violate Appellant's constitutional right to confrontation by limiting his cross-examination of the complainant, we affirm the trial court's judgment.

## I. The evidence is sufficient to prove that Appellant shot the complainant with a firearm.

In his first issue, Appellant contends that the State failed to prove (1) that it was he and not some third party who committed the offense and (2) that Appellant used or exhibited a deadly weapon. We note that Appellant was charged only as a principal and not as a party.

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[2]

At approximately 7:25 p.m. on the evening of September 18, 2008, Arlington police officers were dispatched to the scene of a shooting. When they arrived about five minutes after receiving the dispatch, it was sunny; no street lamps were on, and no car headlights were in use. The complainant, Omololu Akinlolu (Omar), was lying face down on the ground, bleeding heavily. The police saw several holes in Omar's back, shoulder, and legs, as well as sixteen shell casings lying nearby in the street. No gun was found at the scene.

---

[2]*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

2

At the scene, Omar appeared to be scared and in pain. Omar told the police that he knew who had shot him but closed his eyes and "started fading out" before he could identify the shooter. When asked if there was another person in the car, Omar replied, "I don't know who the person was."

EMS arrived about three minutes after the police. They transported Omar to John Peter Smith in Fort Worth, where he was treated. None of the bullet wounds were life-threatening. The police testified that after he was stabilized, Omar told them that he had been walking, jogging, or running in his neighborhood, listening to music. His cell phone rang. As he attempted to answer the phone, shots rang out. Omar ultimately told the police that Appellant, Dwayne James, and Andrew Schuster were responsible for the shooting and that he had seen James and Appellant shooting at him. Omar told the police that he had been shot several times and had fallen down. After he fell, he saw the men leave the scene in a silver-colored SUV.

The police learned that all four men were associated with a record company. Omar told them that he had written a song for Appellant and Schuster, but they still owed him money for it.

Omar testified that on the day of the shooting, he had haggled with James and Appellant about how much was owed and where the payoff would occur. Finally, Appellant called Omar back and told him that Schuster was near Omar's neighborhood and had some money that he would bring to Omar's house. Schuster called Omar and said that he was coming but then texted that he would

3

be delayed. After a while, Omar stopped waiting on Schuster and went for a jog. Omar left his house around 6:45 or 7:00 p.m. He had his cell phone and iPod. Omar testified that he noticed soon after he began jogging that he had missed a couple of calls from Schuster. Omar called Schuster back, but he did not answer. Omar then continued jogging. He felt his phone vibrating, reached for it with his right hand, heard shots, and a bullet grazed the middle finger of his left hand as he moved his headphones with his left hand. Omar testified:

> I turned around and looked. I seen [Appellant]—I seen [James] driving, like a truck. He was in the front. He was driving and shooting out the window, and I seen [Appellant] in the back seat with the window down, and I seen shots coming from over there, and I tried to run.

Omar confirmed that Appellant was in the back seat and that shots were also coming from Appellant's location. Omar testified that he was shot in the arm when he turned to run. Then he tried to run left. He testified that then he saw both James and Appellant shooting at him from outside the vehicle. He was between them. He finally fell and pretended to be dead. He testified that he heard what he thought were twenty-five to thirty shots after he fell. Omar remembered telling the police that he knew who had shot him, that he saw one gun "for sure," and that he had seen flashes from the other gun. He confirmed that he had told the police that Appellant and James had shot him.

Omar testified that the shooting caused him pain and that Appellant and James had placed him in fear of and threatened him with imminent bodily injury.

4

Omar identified both James and Appellant as the shooters in pretrial photo lineups, and he also identified them both in court.

A forensic examiner testified that the sixteen recovered casings, twelve from one manufacturer and four from another, were likewise fired from two different firearms.

Applying the appropriate standard of review, we hold that the jury could have found beyond a reasonable doubt that Appellant had shot Omar with a deadly weapon. We therefore overrule Appellant's first issue.

## II. The trial court did not abuse its discretion or violate Appellant's right to confrontation by limiting the cross-examination of Omar.

In his second issue, Appellant contends that "[t]he [t]rial [c]ourt also erred by denying [him] the right to fully cross-examine [Omar]" and that "[m]any questions were not allowed that would have shown the jury that there were others in the rap community with the motive and ability to harm [him]." We note that Appellant and James were tried together and that each had his own lawyer.

Despite an earlier order granting the State's motion in limine, James's trial counsel asked Omar about a shooting that occurred at a Grand Prairie residence where he had frequently stayed. The Grand Prairie shooting happened about six weeks before Omar's shooting. The State objected. On voir dire by James's defense counsel, Omar testified that he had no knowledge of the Grand Prairie shooting (before the State's objection was sustained on hearsay grounds); that people who had a "beef" with him would not be the type of people that could

5

carry guns, although they would want to fight; that there was no motive for anyone else out there to be mad at him, or at least not mad enough to try to kill him; and that a fight he had in a club soon after his shooting had no connection to his shooting because it was just over a woman (despite his earlier testimony before the jury that the attacker in the club was a friend of both Appellant and James). Omar also testified in response to James's defense counsel's questions on voir dire that the rap music industry is very competitive but that that was not a motive for anyone besides the defendants to harm him, and he explained why he had referred to himself as "Segal" in a YouTube video. The trial court did not allow Omar to answer, even in the proffer,

- Talk to me about those other rappers that have been around in the industry prior to you guys, the younger group, here coming into the industry.

- Talk to me about the ones that you made the video about, those rappers. What w[ere] those beefs about?

- Tell me about . . . the YouTube video, that you had a beef with some guys at the club, tell me about that.

When asked whether he would like to ask any questions of Omar on voir dire, Appellant's defense counsel declined. After the proffer, James's defense counsel argued that the Confrontation Clause under both the federal and state constitutions allowed her to cross-examine Omar and establish "any motives or reasons for things and explanations on this." Regarding the Grand Prairie incident, she stated that she believed that "there could have been someone else out there that was interested in shooting this man."

6

In response to the State's relevancy objection and the trial court's inquiry,

"[A]nything?", Appellant's defense counsel argued,

> I believe there is a relevancy, because this, in fact, is . . . the witness that we need to tie this together to . . . develop our theory. There's been a video made where he does talk about the beefs he's got going on, talking—as a matter of fact, talking about some specific other rappers he's having problems with, and we believe that . . . as a defense, we have a right to put on another theory and to develop our theory with whatever witnesses we have, and this was the witness we can develop that theory through.

The following dialogue then occurred:

> THE COURT: Yeah, but it still has to be legally admissible, correct?
>
> [DEFENSE COUNSEL]: Correct.
>
> THE COURT: And he has specifically said that there wasn't anybody else that . . . would have a reason to do anything like this. I mean, he said that. So perhaps there is other witnesses, and then you call him back in, but at this point, you know, he's denied anything that would . . . amount to—based on his testimony.
>
> [DEFENSE COUNSEL]: Your Honor, I believe he actually said he had a beef with some other people. He later said, if I remember correctly, that he did not believe the beef was of such a nature that they would have shot him. But he did, in fact, have another beef with some other people.
>
> I believe that we should be able to explore that. And likewise, with the shooting at the house, you know, this is a house that he resided at and stayed at, and it was, in effect, a drive-by shooting.
>
> THE COURT: Except that the question was hearsay. So I'm not saying—you know, perhaps there is another way to get this evidence in, but that doesn't mean that you don't have to follow the rules of evidence.

On the following day of trial, the trial judge clarified her ruling:

Here's the only questions that are allowed: "Are you aware of people that could have a problem with you, as far as you know, might have a beef with you? "Could they be the type of people that could carry guns?" . . . And . . . then your question was, "The type of people that would want to get into a fight?" That's allowed. "Is there any motive out there for why anyone else would be mad at you?" That's allowed. . . . "Is there a reason why anyone else out there would be mad at you in the last few years?" And that's allowed if you alter it to be more close in time. "Last few years" is not allowed. . . . The question, "But the money in this case was enough motive for someone to want to kill you for $2,000?" That's allowed. The question is allowed. "That's not a lot of motive—do you think that's a lot of—that's a lot to kill someone over $2,000?" That's allowed. . . . [T]his question is allowed: "On that level, is there anyone else that would have similar types of motive that would want to retaliate against you for any reason whatsoever?" "This is a very competitive business, isn't it?" That question is allowed. "And there—and that the competitive business would not be a reason for a motive to want to put harm to you?" That's allowed. This question is allowed: "But these guys here tried to do that; is that right?" And then the question: "Okay. So they were willing to risk everything?" And the question: "So why are you Segal. . . ?"

Appellant's defense counsel asked Omar only a few of these questions when he cross-examined him later that same day. James's counsel did not ask any. Neither party called any other witnesses regarding the YouTube video or the fight at the club. Neither party introduced the YouTube video.

On the following day, Appellant's defense counsel notified the trial court that he intended to call a Grand Prairie officer who investigated the Grand Prairie shooting to testify merely about the damage to Schuster's vehicle, the vehicle that other evidence indicated had been used in Omar's shooting. The State did not object.

8

The officer testified that she responded to a call on August 4, 2008, and made a report. She further testified that a beige Ford Expedition owned by Schuster had been damaged. Specifically, "[t]he rear window was shot out" and "[t]he right rear passenger door had a bullet hole." On cross-examination, the officer testified that the VIN number of the beige Ford Expedition involved in the August 4, 2008 shooting matched the VIN number of the Ford Expedition described as silver in State's Exhibit 78, a purchase order naming Angelica Schuster as the buyer. The State had offered State's Exhibit 78 as evidence that Schuster's Ford Expedition had been used in Omar's shooting.

The Grand Prairie officer also testified that Schuster had suggested that some Asian rappers might have been behind the Grand Prairie attack. Neither defendant followed up this line of questioning.

Appellant did not specifically object to the exclusion of any of the proffered evidence on the basis that it infringed on his right to cross-examination, nor does he direct us to any place in the record where he explicitly adopted James's objection. Further, we have found no indication in the record that he explicitly adopted James's objection. Generally, these absences from the record would result in our holding that an appellant had forfeited his complaint.[3] But here, it is clear that both defendants wanted the proffered evidence admitted, both argued

---

[3]*See* Tex. R. App. P. 33.1; *Lerma v. State*, 679 S.W.2d 488, 498 (Tex. Crim. App. 1982); *Martinez v. State*, 833 S.W.2d 188, 191 (Tex. App.—Dallas 1992, pet. ref'd).

for its admission but raised distinctive arguments, and both defendants' arguments were resolved in a joint hearing. Given the state of the record and the law, we cannot comfortably conclude that the trial court did not view the defense's objections regarding the proffered evidence as joint.[4] We therefore address Appellant's issue on the merits.

The Sixth Amendment right of confrontation includes the right to cross-examine witnesses to challenge their credibility and expose possible biases, self-interest, or motives in testifying.[5] A trial court has broad discretion to limit the scope and extent of cross-examination.[6] A trial court may restrict cross-examination based on concerns of harassment, prejudice, confusion of issues, or endangering the witness or when the questioning is repetitive or of only minimal relevance.[7]

The record shows that the defense did not delve into the matters allowed by the trial court as fully as permitted, whether with Omar, the Grand Prairie

---

[4]*See Dixon v. State*, 928 S.W.2d 564, 565 (Tex. Crim. App. 1996) (reversing this court's opinion holding that error was not preserved by Dixon's general objection because the trial court treated the objection as an adoption of the defense witness's counsel's objection).

[5]*Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 1110 (1974); *Hammer v. State*, 296 S.W.3d 555, 561 (Tex. Crim. App. 2009).

[6]*Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 1435 (1986); *Hammer*, 296 S.W.3d at 561.

[7]*Van Arsdall*, 475 U.S. at 679, 106 S. Ct. at 1435; *Hammer*, 296 S.W.3d at 561 n.7.

police officer, or other witnesses that could have been called but were not. Further, excluded testimony in the voir dire of Omar did not reveal that his answers before the jury would have been relevant. Additionally, the record contains evidence that the YouTube video and fight at the club happened after Omar's shooting, and the record reveals no relevance of those events to Omar's shooting. The record also contains plenty of other evidence from which the jury could have judged Omar's credibility, and Appellant's defense counsel aptly emphasized that evidence, including the conflicts between Omar's testimony and his statements to the police. Consequently, we cannot conclude that the trial court abused its discretion or violated Appellant's right to confrontation by limiting defense counsel's questioning of Omar. We overrule Appellant's second issue.

## III. Conclusion

Having overruled both of Appellant's issues, we affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL: DAUPHINOT, GARDNER, and WALKER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: November 23, 2011